IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST DIRECT TELESERVICES,
INC.,

        Plaintiff,

                          3:11-CV-910-PK

v.                             FINDINGS AND
                             RECOMMENDATION

MAX ZWEIZIG,

        Defendant.

PAPAK, Magistrate Judge:

On July 15, 2011, plaintiff Northwest Direct Teleservices, Inc.("NDT"), filed a petition in

the Clackamas County Circuit Court to vacate an arbitral award resolving an employment dispute

between the parties in defendant Max Zweizig's favor.  Zweizig removed NDT's petition to this

court effective August 1, 2011, and subsequently filed a cross-petition to vacate in part and

confirm in part the subject arbitral award.  This court has jurisdiction over these proceedings

pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of the parties and the amount in

controversy.

Now before the court are NDT's petition (#1) to vacate the arbitral award, and Zweizig's

petition (#9) to vacate in part and confirm in part the arbitral award.  I have considered the

Page 1 - FINDINGS AND RECOMMENDATION

parties' petitions, all of the pleadings on file, and oral argument on behalf of the parties. For the reasons set forth below, NDT's petition should be denied, Zweizig's petition should be denied to the extent it seeks vacatur in part of the arbitral award and otherwise granted, and the underlying arbitral award should be confirmed in its entirety.

## LEGAL STANDARD

Pursuant to the Federal Arbitration Act, a district court may vacate an arbitration award:

(1)   where the award was procured by corruption, fraud, or undue means;

(2)   where there was evident partiality or corruption in the arbitrators . . . ;

(3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). "The burden of establishing grounds for vacating an arbitration award is on the party seeking it." *United States Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010), *citing Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1489 (9th Cir. 1991). Unless the reviewing district court determines that the arbitration award is subject to vacatur or to modification, the court must confirm the award. *See* 9 U.S.C. § 9.

## FACTUAL BACKGROUND

On August 18, 2001, NDT and Zweizig entered into an Employment Agreement, pursuant to which NDT agreed to employ Zweizig as its IT Director, beginning September 1,

2001. The Employment Agreement specified that Zweizig's employment would be at-will, terminable at any time and for any reason by either party. The Employment Agreement further provided for a mandatory "two-step resolution process" for resolving any disputes between NDT and Zweizig, under the terms of which the parties would first submit their dispute to mediation through Arbitration Services of Portland, Inc.("ASP"), at no administrative cost to Zweizig, and, in the event mediation failed to resolve the dispute, would next submit their dispute to "final and binding arbitration in Multnomah County, Oregon, through a mutually agreed upon arbitration service or, if no agreement c[ould] be reached, through the arbitration services and procedures of" ASP.

The Employment Agreement specified that "Oregon State law (excluding choice of law provisions) and applicable federal law will govern and be applied by the arbitrator in deciding all substantive aspects of the [parties' dispute], and all procedural issues not covered by the applicable arbitration rules." The Employment Agreement further specified that the parties would equally share the arbitrator's fees, court reporter's fees and costs, and other administrative fees, and would bear their own attorney fees as well as fees or costs incurred in connection with discovery, depositions, or witnesses.

The executed copy of the Employment Agreement that has been submitted into evidence contains a number of handwritten amendments, each bearing the initials "MZ." It appears undisputed that these amendments were proposed by Zweizig and agreed to by NDT.

Zweizig worked for NDT from September 1, 2001, through November 14, 2003. During that time, he received uniformly or near-uniformly positive performance reviews. Nevertheless, at arbitration NDT offered into evidence documents purportedly from Zweizig's personnel file

describing concerns NDT's principal, Timothy Rote, apparently harbored regarding Zweizig's job performance. Zweizig took the position in the course of arbitral proceedings that these documents had not been shared with him prior to the termination of his appointment, and moreover that some or all of them had not been prepared contemporaneously. In support of his position, it appears that Zweizig presented evidence at arbitration that at least one of the documents contained criticism of Zweizig's performance in preparing a document that was not created until several months after the purported date of the performance review.

NDT asserts that it terminated Zweizig with 45 days' notice, via an email message dated October 2, 2003. In support of this assertion, NDT relied at arbitration on a hard copy of the email message purportedly effecting Zweizig's termination, bearing the date October 2, 2003. For his part, Zweizig vigorously disputes NDT's assertion, as he likewise did in the course of arbitral proceedings. Zweizig's position is, and was at arbitration, that he never received the email message in question, and that Rote created it after the fact along with a forged date-stamp.

It is undisputed that on October 23, 2003, Zweizig contacted Rote to advise him that he had received via email a spreadsheet suggesting that NDT was systematically over-billing some of its clients. Zweizig requested that Rote investigate the matter, which he characterized as potentially illegal conduct. Zweizig retained Oregon counsel in connection with the matter on October 28, 2003. That same day, Zweizig's counsel referred the matter to the Oregon Department of Justice by letter, setting forth all of the underlying facts, and providing a copy of the letter to Rote.

It is further undisputed that on October 29, 2003, the day after Rote received the letter from Zweizig's counsel, Rote began reassigning Zweizig's employment duties. Rote ultimately

terminated Zweizig's employment effective November 14, 2003, although (as noted above) the parties dispute whether Rote noticed the termination prior or subsequent to his receipt of the ODOJ letter.

It is NDT's position that, at the time of his termination, Zweizig reformatted two company computers that he had been using to perform his employment duties, effectively destroying certain work product proprietary to NDT. NDT further takes the position that the reformatting constituted spoliation of evidence, specifically the provenance of the spreadsheet reflecting the purported over-billing.

Following Zweizig's termination, NDT initially reported to the Department of Labor that Zweizig had been discharged for fraud, and on that basis refused to pay him unemployment benefits. It appears that NDT subsequently reversed itself, and paid Zweizig unemployment benefits for a period of time. It further appears that Rote and/or NDT sent letters to New Jersey law enforcement officials and others, purporting to advise them that Zweizig had stored child pornography on a company computer, following Zweizig's termination.

Zweizig, a New Jersey resident, filed an employment action in the New Jersey courts on March 18, 2004. The 2004 action was later dismissed prior to resolution of its merits, in order to permit the dispute to be resolved in arbitration.

There is no indication in the record that the parties underwent mediation of their dispute, as provided in the Employment Agreement. Nevertheless, in April 2006, NDT filed a statement of claims with Arbitration Services of Portland, initiating arbitral proceedings. Zweizig filed counterclaims for retaliatory discharge in violation of Or. Rev. Stat. 659A.230 and for common-law wrongful discharge, and requested award of his attorney fees incurred in connection with

arbitral proceedings. The parties selected Portland attorney William Crow to arbitrate their dispute.

In December 2009 Linda Marshall, counsel for Zweizig both in connection with the arbitration and in connection with this action, disclosed to Scott Cliff, counsel for NDT, that she and Crow had been colleagues at the same law firm some years previously. However, it appears undisputed that Crow himself made no such disclosure to the parties.

Arbitral hearings took place over ten non-consecutive days between May and November 2010. Early in the course of those proceedings, Rote took over NDT's representation from Cliff, although it appears that he may have continued to consult with the company's former attorney over the course of the proceedings. Shortly after Rote took over NDT's representation, on or around June 28, 2010, Rote heard Crow and Marshall make reference to a dinner party at which both had been present some years before, when each was a partner at the Miller Nash law firm. Just over three weeks later, on July 20, 2010, Rote filed a bar complaint against Marshall accusing her of various ethical violations, and asserting Rote's opinion that Marshall was relying on her "prior employment history with the arbitrator" for "a certain comfort" that he would overlook her supposed ethical lapses. Rote expressly stated, however that "Mr. William Crow . . . appears very fair," and did not suggest that Crow had displayed any degree of bias in the course of arbitral proceedings up to that time.

The bar official investigating Rote's complaint requested further information of Rote, which he provided by letter dated December 12, 2010. At that time, all hearings before the arbitrator had already taken place, and the parties were preparing their post-hearing briefs. In his December 2010 letter to the bar investigator, stating that he "want[ed] to make this point clearly,"

Rote again affirmed that "Mr. Crow ha[d] been fair and balanced during the course of th[e] arbitration."

Despite the foregoing, Rote included a statement in NDT's post-hearing memorandum that "NDT and Rote were unaware of the prior seventeen year work relationship [Marshall] had with arbitrator Crow while at Miller Nash some years ago," and that over the course of arbitration there had been "the benefit of credibility afforded to Marshall. . . ." In response, Crow emailed the parties indicating his intention to decline to rule, and to recuse himself from arbitrating the parties' dispute. Marshall responded by requesting that Crow permit the ASP to determine whether or not Crow should be prohibited from arbitrating the parties' dispute on the basis of evident partiality, and Crow agreed to permit the ASP to resolve the matter. In response to Crow's message, Rote advised Zweizig, Marshall, and Crow that he would "respond further after consulting with counsel." Marshall responded to that email message from Rote, replying directly to Rote (and no other recipient) as follows:

> And what counsel is he going to check with?
> Scott Cliff?
> This is my point.

Within twenty minutes of sending the above reply, Marshall sent a second email to Rote, apologizing and indicating that her comment had not been intended for Rote. NDT now characterizes the message as an attempted *ex parte* contact with Crow, whereas Marshall takes the position that she intended to send the message to Zweizig.

On February 14, 2011, Rote sent the ASP a written claim of conflict of interest, which he expressly characterized as "not an attack on Mr. Crow's integrity." The gravamen of the claim was that, despite Rote's expressed belief that Crow was "an honest man and a good arbitrator,"

Marshall "intend[ed] to capitalize on the substantial prior work relationship between her and Crow. . . ." On February 18, 2011, the ASP ruled that Crow should not be disqualified from serving as the parties' arbitrator, reasoning as follows:

> **Determination by ASP.** Acting for ASP, I have discussed this matter with Arbitrator Crow, who left the Miller Nash law firm several years ago. Mr. Crow states that he never "worked with" [Zweizig]'s attorney, that he believed (correctly or incorrectly) that she was a labor law lawyer, that there were nearly 100 lawyers at the large Miller Nash form and that she was just one of a large proportion of those Miller Nash lawyers with whom he had no working relationship. Even more importantly, Arbitrator Crow is absolutely certain that neither the fact that [Zweizig]'s attorney worked at the Miller Nash firm while he was there, nor any other circumstance, would prevent him from continuing to be unbiased and unprejudiced and from rendering a just and impartial decision. Although Arbitrator Crow initially and briefly believed that self-recusal would serve the parties' interest, upon further reflection he declined (and continues to decline) to recuse himself, and he will allow any challenge to be determined by ASP.

> **The "Work Relationship": Factual Determination.** When Ms. Marshall began to represent [Zweizig], she informed [NDT]'s attorney, Scott Cliff, "that she had worked at Miller Nash for a short time and at the same time as Mr. Crow", and it appears that Mr. Cliff was correct in concluding that "such a limited work relationship would be of limited consequence." In June, 2010, when [NDT] states it first learned of the Miller Nash connection, [NDT] then could have triggered an inquiry that may have led to the challenge [NDT] now registers. But, whether in June 2010 or now, Mr. Crow's recollection (and the facts) would be the same: he had limited knowledge of [Zweizig]'s attorney and had no "working relationship" with her.

> **Subjective Beliefs of [NDT].** ASP accepts the sincerity of [NDT]'s concerns. ASP is also aware that justice must not only be done, it must also appear to be done. But, the requirement that justice must be done (and appear to be done) must be based on objective standards. It would subvert justice to allow one party to terminate an arbitrator during the proceedings based on a subjective belief that the arbitrator could somehow be unfairly swayed or biased or prejudiced. And, as [NDT] itself stated: "We believe [Crow]'s an honest man and a good arbitrator."

> **Conclusion.** Accordingly, pursuant to ASP Rule 12, ASP has determined that Arbitrator Crow should not be disqualified.

In his decision deciding the parties' dispute, Crow indicated that, "by and large, the

witnesses (with the exception of Mr. Kawiuk) were credible." However, he further stated as

follows:

> Because of the lapse of time from the beginning of this dispute (through no particular fault of anyone, with the regular change of counsel by both parties contributing significantly to the delays), memories have dimmed and testimony has been based on memories of events that to a large extent happened years ago. Therefore, I find that when memories conflict among the witnesses and parties, or the exhibits, I must rely on contemporaneous writings to resolve the conflicts.

In keeping with that statement, Crow resolved the parties' dispute over the date on which Rote

noticed Zweizig's termination as follows:

> The parties are in disagreement about when the October 2, 2003, email was prepared and sent. The testimony of the experts leaves questions open about that controversy, but to the arbitrator it is difficult to harmonize this email with . . . one written by Mr. Rote just 80-90 hours earlier.

> The regular exchange of emails from October 2, 2003, do not suggest that [Zweizig] has been terminated, but rather are consistent with the expectation of continued employment. As late as October 23, 3003, Mr. Rote sent an email to [Zweizig]: "Hope all is OK Max. let me know if I can help." . . .

> Only after the report by [Zweizig] of his concerns over the possibility of overcharging and correspondence with the State of Oregon to that effect did Mr. Kawiuk start his search for emails trying to discredit [Zweizig] and did the correspondence between [Zweizig] and Mr. Rote take on the hint that termination was imminent.

On that basis, the arbitrator found that Rote did not notice Zweizig's termination until a date

subsequent to October 23, 2003.

In connection with NDT's claims, the arbitrator found that NDT was entitled to an award

of $4,316.94 paid for court reporting fees, but otherwise found against NDT on all of its claims,

including its claims that Zweizig breached the Employment Agreement by destroying or deleting

NDT's proprietary software, converted computers belonging to NDT, and was liable to NDT in

the amount of the attorney fees NDT incurred in connection with Zweizig's 2004 action against NDT. In connection with Zweizig's claims, the arbitrator expressly found that "the catalyst for [Zweizig's] termination at the time it took place was in retaliation for the action [Zweizig] took over his belief that there might have been efforts at overbilling some [NDT] clients." In connection with Zweizig's discharge, the arbitrator awarded nine months' salary plus one week's vacation pay, or $69,375. In addition, the arbitrator awarded Zweizig $1,000 in connection with NDT's initial refusal to pay Zweizig unemployment benefits following his termination, and $5,000 in connection with NDT's letters to law enforcement officials regarding allegations that Zweizig stored child pornography on a company computer. The arbitrator expressly declined to award Zweizig his requested attorney fees or to award damages in Zweizig's favor for alleged emotional distress.

Both parties filed motions for reconsideration of the arbitrator's order, and both requests were ultimately denied. This action followed.

## ANALYSIS

The parties disagree as to whether the standard governing their respective petitions for vacatur should be drawn from federal or from state law. The Ninth Circuit recently addressed this issue in *Johnson v. Gruma Corp.*, 614 F.3d 1062 (9th Cir. 2010):

> The F[ederal] A[rbitration] A[ct], while it does not itself create independent federal jurisdiction, creates a body of federal substantive law establishing and regulating arbitration agreements that come within the FAA's purview. When an agreement falls within the purview of the FAA, there is a strong default presumption that the FAA, not state law, supplies the rules for arbitration. To overcome that presumption, parties to an arbitration agreement must evidence a "clear intent" to incorporate state law rules for arbitration.

*Johnson*, 614 F.3d at 1066 (citations, internal quotation marks, and internal modifications

Page 10 - FINDINGS AND RECOMMENDATION

omitted).  The *Johnson* court noted that "where the FAA's rules control arbitration proceedings, a reviewing court must also apply the FAA standard for vacatur," and that, conversely, "[w]here state arbitration rules control arbitration proceedings, [the court] must apply the state vacatur standard." *Id.* at 1067.

The *Johnson* court considered an arbitration agreement which required that arbitration be "conducted and subject to enforcement pursuant to the provisions of California Code of Civil Procedure sections 1280 through 1295, or other applicable law." *Id.* at 1067.  Although the court specified that a mere choice-of-law provision providing that the agreement itself was to be governed by state law would not be sufficient to overcome the presumption in favor of Federal Arbitration Act rules, *see id.* at 1066-1067, the court found that where the agreement specified that the arbitration itself was to be conducted in accordance with state law, the provision "exhibit[ed] the parties' 'clear intent' that" state procedures would govern, overcoming the presumption in favor of FAA procedures, *see id.* at 1067.

Contracts of employment are within the purview of the Federal Arbitration Act, *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114 (2001), *see also Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 877, n. 3, (9th Cir. 2007), and thus the rebuttable presumption that the FAA vacatur standard governs the parties' petitions is applicable here, *see Johnson*, 614 F.3d at 1066-1067.  As noted above, the parties' Employment Agreement specifies that "Oregon State law . . . and applicable federal law will govern and be applied by the arbitrator in deciding all . . . procedural issues not covered by the applicable arbitration rules."  The parties' express intent that *both* Oregon law *and* applicable federal law would govern arbitral procedures cannot be read as an expression of clear intent that Oregon law *rather than* federal law should govern.  Although

Page 11 - FINDINGS AND RECOMMENDATION

the *Johnson* court rejected the argument that the federal standard should apply where the agreement provided that California law "or other applicable law" would govern arbitral procedures, *Johnson*, 614 F.3d at 1065, 1067, here the parties' use of the conjunctive "and" in lieu of the disjunctive "or," together with their specification that "applicable federal law" in lieu of the less precise "other applicable law" would control, mitigate strongly in favor of reading the parties' arbitration provision as expressing no clear intent to displace FAA procedural rules. The court therefore should apply the FAA vacatur standard in resolving the parties' petitions rather than the standard applicable under Oregon law.[1]

The vacatur standard applicable here under the FAA is as follows:

In any of the following cases the United States court in and for the district wherein the award was made **may** make an order vacating the award upon the application of any party to the arbitration—

    (1)    where the award was procured by corruption, fraud, or undue means;

    (2)    where there was evident partiality or corruption in the arbitrators, or either of them;

    (3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

    (4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a) (emphasis supplied). Where none of the foregoing four circumstances is

---

[1] Notwithstanding the foregoing, my analysis as discussed below establishes that the same result would obtain whether the court applied the Oregon or the FAA vacatur standard.

present, the district courts lack discretion to vacate an arbitration award in whole or in part, *see Lagstein v. Certain Underwriters at Lloyd's*, 607 F.3d 634, 640 (9th Cir. 2010), and where an award is neither vacated pursuant to Section 10(a) nor modified pursuant to 9 U.S.C. § 11 (the provisions of which are not at issue here), the reviewing district court must confirm the award "even in the face of erroneous findings of fact or misinterpretations of law," *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003) (*en banc*); *see also* 9 U.S.C. § 9.

The scope of a district court's review of an arbitral decision is "extremely limited" under the FAA. *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th Cir. 2003). Under Section 10, the courts may not review the merits of an arbitration decision, and even clear error in the interpretation of law is not sufficient to vest a reviewing court with discretion to vacate. *See Collins*, 505 F.3d at 879. By contrast, arbitrators are deemed to have exceeded their powers, creating discretion to vacate, where they exhibit "manifest disregard" of the law. *Id.* "Manifest disregard" is established only where it is shown that an arbitrator "understood and correctly stated the law, but proceeded to disregard the same." *Id.* (internal modifications omitted), *quoting San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9th Cir. 1961). "Moreover, to rise to the level of manifest disregard the governing law alleged to have been ignored by the arbitrators must be *well defined, explicit, and clearly applicable*." *Id.* (internal quotation marks and modifications omitted; emphasis original), *quoting Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir 2004). The party seeking vacatur of an arbitral award bears the burden to establish that grounds for vacatur are present. *See United States Life Ins.*, 591 F.3d at 1173.

I.   **NDT's Petition to Vacate**

NDT asserts, first, that the arbitral award was procured by corruption, fraud, or undue means, which, if established, would constitute grounds for discretionary vacatur under 9 U.S.C. § 10(a)(1). NDT's primary argument under this rubric is that corruption, fraud, or undue means may be inferred from the fact that Zweizig's counsel Marshall and arbitrator Crow had been colleagues at the Miller Nash law firm prior to the arbitration proceedings, and/or from Marshall's purported failure to disclose the details of the relationship accurately prior to the arbitration or Crow's undisputed failure to disclose the former collegial relationship in any manner. In response to NDT's argument that impropriety may be inferred from the former collegial relationship itself, Zweizig offers Marshall's declaration that she and Crow had ceased to be colleagues more than 12 years before the first day of arbitral hearings, that she and Crow had never worked together on a case nor served on the same committee while employed at Miller Nash, that she knew Crow only minimally while working at Miller Nash, and that in the subsequent years they met only once prior to the arbitral proceedings, by chance, on which occasion they nodded their mutual recognition of one another without further interaction. The foregoing is entirely consistent with information Crow provided to Arbitration Services of Portland officials in connection with Rote's request that Crow be disqualified from arbitrating the parties' dispute.

In opposition to NDT's argument that impropriety may be inferred from Marshall's purported failure to disclose the details of her former collegial relationship with Crow accurately, Zweizig offer's Marshall's further declaration that on a date approximately six months before arbitral proceedings began, she advised NDT's then-counsel Scott Cliff that she and Crow had

both been partners at Miller Nash, without reference to how long their tenures there had

overlapped, and that Cliff expressly stated that the relationship would not be a problem.

Marshall's declaration is consistent with information she previously provided to Oregon State Bar

officials investigating Rote's ethics complaint against her, and broadly consistent with Rote's

evidentiary submissions to the Bar.  In opposition to NDT's argument that impropriety may be

inferred from Crow's failure to make any prior disclosure of his former collegial relationship with

Marshall, Zweizig offers the argument that NDT effectively waived its right to seek vacatur on

the basis of the failure to disclose by failing to investigate the relationship or to raise any

objection to the failure to disclose until after all arbitration hearings had closed.

        The court need not consider in this context whether Zweizig's arguments fairly address

the gravamen of NDT's arguments, because NDT's arguments and evidentiary proffers fall well

short of establishing that the arbitral award was procured by corruption, fraud, or undue means.

While NDT's submissions have arguable relevance to the question of whether Crow displayed

"evident partiality," a separate ground giving rise to discretionary vacatur pursuant to Section

10(a)(2) -- and, indeed, NDT rehearses the same arguments and relies upon the same evidentiary

submissions in support of its argument for vacatur under Section 10(a)(2) – they simply do not

bear on the question whether Zweizig procured the award in his favor by affirmative "corruption,

fraud, or undue means."  That is, it cannot be inferred from the prior acquaintance of Crow and

Marshall, from Marshall's manner of disclosing it, or from Crow's failure to disclose it that

Zweizig, *e.g.*, bribed, blackmailed, coerced or defrauded the arbitrator, or otherwise relied upon

affirmative improper means to procure the favorable award.  The court therefore lacks discretion

to vacate the arbitral award pursuant to Section 10(a)(1) based on the prior collegial relationship

Page 15 - FINDINGS AND RECOMMENDATION

between Marshall and Crow and/or the manner in which that relationship was or was not disclosed prior to arbitral proceedings.[2]

NDT adduces further support for its argument that Zweizig procured the award in his favor by corruption, fraud, or undue means in the form of argument and evidence purportedly indicating that Justin McAnn, Zweizig's forensics expert, provided fraudulent testimony to the arbitrator. Specifically, NDT offers Rote's declaration that, following the close of arbitral proceedings, McAnn discussed with him over the telephone "at length that he represented [Zweizig] on a contingent fee basis," and that "[p]rior to that call," Rote "discovered that McAnn misrepresented [to the arbitrator] his resume of experience, in particular that he taught classes on forensics at the University of Washington." NDT further provides, as an exhibit to Rote's declaration, a copy of an email message from a person purportedly employed at the university's Professional & Continuing Education information center, indicating that message sender was unable to locate any record of McAnn "at UW PCE [or] under the main campus UW faculty/staff directory." In addition, NDT argues, without supporting evidence, that Marshall may have "scripted" McAnn's testimony. In response, Zweizig offers McAnn's testimony that he was never party to any form of contingency fee arrangement with Zweizig and did not otherwise have any financial stake in the outcome of the arbitration, that to the contrary he invoiced Zweizig and was paid by him on an hourly basis, that he never informed Rote otherwise at any time, and that his

---

[2] Even if the court were to apply Oregon's statutory vacatur standard in lieu of the FAA standard, the same conclusion would obtain. Oregon's standard, set forth at Or. Rev. Stat. 36.705, provides for mandatory rather than discretionary vacatur where an "award was procured by corruption, fraud or other undue means," Or. Rev. Stat. 36.705(1)(a). Because, for the reasons set forth above, it is not possible to infer from the prior acquaintance of Crow and Marshall that Zweizig procured the award in his favor by such means, mandatory vacatur under Section 705(1)(a) would be inapplicable here.

Page 16 - FINDINGS AND RECOMMENDATION

credentials, including his status as an instructor of digital forensics at the University of

Washington Professional and Continuing Education Program, were as described to the arbitrator.

Zweizig further offers into evidence his hourly fee agreement with McAnn, McAnn's invoices

indicating an hourly rather than contingency basis for calculating McAnn's fees, McAnn's W-2

forms indicating that the University of Washington pays McAnn's salary for services as an

instructor, and a copy of a page of the university's web site listing McAnn as an instructor of

digital forensics. Zweizig further offers Marshall's declaration that she never "scripted" McAnn's

testimony in any manner.

Analysis of the foredescribed evidence establishes that NDT has not met its burden of

proof on this issue. Indeed, in light of the evidence of record it appears significantly more likely

than not that McAnn had no financial stake in the outcome of the arbitration, that McAnn's

credentials were as described to the arbitrator, and that Marshall did not "script" McAnn's

testimony. In consequence, NDT's evidence and argument regarding McAnn, his credentials, and

his testimony provide no grounds for discretionary vacatur under Secion 10(a)(1).[3]

Finally, NDT argues that corruption, fraud, or other undue means may be inferred from

evidence purportedly suggesting that Marshall may have engaged in *ex parte* communications

with Crow over the course of arbitral proceedings. In support, NDT relies chiefly on the email

message, discussed above, that Marshall inadvertently sent to Rote in February 2011, suggesting

that the message may have been intended for Crow. NDT further offers Rote's declaration that

he observed Marshall handing Crow a CD containing an audio recording that was never formally

---

[3] For the same reasons, mandatory vacatur under Section 705(1)(a) would be inapplicable
here even if the court were to apply Oregon's statutory vacatur standard in lieu of the FAA
standard

offered into evidence at arbitration, specifically a recording of a conversation between Zweizig and Bret Mullins, the NDT employee identified by Zweizig as the person who sent Zweizig the spreadsheet purportedly indicating NDT's fraudulent billing practices. Rote characterizes the discussion as constituting an attempt by Zweizig to coerce Mullins into agreeing that Rote had required him, on pain of termination, to sign a memorandum falsely stating that Zweizig himself had fabricated the spreadsheet, whereas Zweizig characterizes the discussion as constituting Mullins' admission that the memorandum misrepresented the facts. In response, Zweizig offers Marshall's declaration that the message she inadvertently sent to Rote in February 2011 was intended for Zweizig and not for Crow, that the audio recording of the conversation between Zweizig and Mullins was intended to be offered for impeachment purposes only, in case NDT offered the Mullins memorandum into evidence, and that the CD was never formally offered into evidence because NDT never attempted to rely on the memorandum during arbitral proceedings.

Again, analysis of the parties' submissions establishes that NDT has not met its burden of proof. That is, the preponderance of the evidence does not indicate that Marshall engaged in improper *ex parte* communications with the arbitrator. The court therefore lacks discretion to vacate the arbitral award pursuant to Section 10(a)(1) based on NDT's position that such communications may have taken place.[4]

NDT asserts, second, that the arbitrator displayed evident partiality in Zweizig's favor which, if established, would constitute grounds for discretionary vacatur under Section 10(a)(2). In support, as noted above, NDT relies in large part upon Marshall's erstwhile collegial

---

[4] For the same reasons, mandatory vacatur under Section 705(1)(a) would be inapplicable here even if the court were to apply Oregon's vacatur standard rather than the FAA standard.

relationship with Crow, and/or upon Marshall's purported failure to disclose the details of the relationship accurately prior to the arbitration or Crow's undisputed failure to disclose the prior relationship in any manner. In addition, however, NDT further relies on the purported fact that Crow refused to credit the testimony of six of NDT's witnesses, impliedly without justification for doing so. Zweizig offers in response Marshall's declaration that she and Crow had ceased to be colleagues more than 12 years before the first day of arbitral hearings, that she and Crow had never worked together on a case or served on the same committee while employed at Miller Nash, that she knew Crow only minimally while working at Miller Nash, and that in the subsequent years they met only once prior to the arbitral proceedings, briefly and by chance. Zweizig also notes that, far from discrediting NDT's witnesses without justification, the arbitrator expressly found all witnesses credible save one, whom he found not credible for several supplied reasons.

"To show 'evident partiality' in an arbitrator, [a party] either must establish specific facts indicating actual bias toward or against a party or show that [the arbitrator] failed to disclose to the parties information that creates 'a reasonable impression of bias.'" *Lagstein v. Certain Underwriters at Lloyd's*, 607 F.3d 634, 645-646 (9th Cir. 2010) (internal modifications omitted), *quoting Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir. 1996). NDT appears to argue for vacatur on grounds of both nondisclosure and actual bias.

To the extent that NDT argues that Crow displayed actual bias in Zweizig's favor, its argument is only marginally colorable. As noted by Zweizig, Crow did not in fact discredit NDT's witnesses wholesale, but rather discredited only one witness, for reasons supplied in detail. Moreover, to the extent that the arbitrator made findings of fact despite contrary

testimony, he did so only after weighing the relative credibility of witness testimony regarding

events years in the past versus records of contemporaneous documents and other

communications. Crow's credibility determinations fall well short of displaying actual bias in

either party's favor.

To the extent that NDT argues for vacatur on evident partiality grounds based on Crow's

failure to disclose his prior relationship with Marshall, the argument presents a case for closer

analysis. "In nondisclosure cases, vacatur is appropriate where the arbitrator's failure to disclose

information gives the impression of bias in favor of one party." *Woods*, 78 F.3d at 427, *citing*

*Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 149 (1969). "A

reasonable impression of bias sufficiently establishes evident partiality because the integrity of

the process by which arbitrators are chosen is at issue in nondisclosure cases." *Id.*, *citing*

*Commonwealth Coatings*, 393 U.S. at 149. It is undisputed that Crow had a duty to disclose any

past or contemporaneous relationship with any party or with counsel for any party before him,

and that he failed to disclose his prior relationship with Marshall. However, the Ninth Circuit

has held that even in nondisclosure cases, "vacatur is only appropriate if the conflict left

undisclosed was real. . . and not trivial," *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*,

501 F.3d 1101, 1110 (9th Cir. 2007) (citations and internal quotation marks omitted), noting that,

"[u]nderstandably, courts have rejected claims of evident partiality based on long past,

attenuated, or insubstantial connections between a party and an arbitrator," *id.*, *citing Positive*

*Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278, 284 (5th Cir. 2007) (*en*

*banc*) (collecting cases). Indeed, the Seventh Circuit has persuasively opined that a relationship

between an arbitrator and a party creates a real conflict only where it is "so intimate – personally,

socially, professionally, or financially – as to cast serious doubt" on the arbitrator's impartiality. *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th Cir. 1983). Here, Crow's relationship with Marshall was so remote in time and so lacking in personal, social, professional, and financial intimacy as effectively to deprive the court of discretion to vacate on the basis of Crow's failure to disclose it. *See New Regency Prods.*, 501 F.3d at 1110. Moreover, NDT arguably waived its right to argue to the contrary in consequence of the Arbitration Services of Portland decision that Crow should not be disqualified from arbitrating the parties' dispute, and of the parties' agreement to abide by the ASP's rules, including ASP Rule 12, which states in relevant part that "the decision of ASP [regarding a parties' request that an arbitrator be disqualified] shall be conclusive on the parties. The court therefore should not vacate the arbitrator's award pursuant to Section 10(a)(2).[5]

NDT asserts, third, that the arbitrator prejudiced its rights through misconduct or other misbehavior, which, if established, would provide grounds for discretionary vacatur under Section 10(a)(3), and/or that the arbitrator exceeded his powers, which, if established, would provide grounds for discretionary vacatur under Section 10(a)(4). Specifically, NDT asserts that

---

[5] Unlike under the FAA standard, under Oregon's standard vacatur is mandatory where an arbitrator displays "evident partiality," Or. Rev. Stat. 36.705(1)(b)(A), which, under Oregon law, refers to "manifest" or "discernable" partiality rather than the mere appearance or possibility of partiality, *see Prime Props. v. Leahy*, 234 Or. App. 439, 445-446, 449 (2010). As under the FAA standard, under Oregon law an arbitrator's failure to disclose "[a]n existing or past relationship with any of the parties to the agreement to arbitrate or . . . their counsel" gives rise to discretionary vacatur. Or. Rev. Stat. 36.650(1)(b), 650(4). Because, as discussed above, NDT has failed to meet its burden to establish actual bias, mandatory vacatur under Section 705(1)(b)(A) would be inapplicable even if the court were to apply the Oregon rather than the FAA vacatur standard, and because, also as discussed above, the undisclosed relationship was so attenuated and so remote in time as not to provide grounds for vacatur, discretionary vacatur would be inappropriate under Section 650(4).

Page 21 - FINDINGS AND RECOMMENDATION

the arbitrator prejudiced its rights by discrediting NDT's witnesses, impliedly without adequate justification, by crediting Zweizig and his witnesses, again impliedly without adequate justification, and by erring as a matter of law when he awarded Zweizig emotional distress damages in connection with Rote's allegedly defamatory statements regarding Zweizig's purported use of an NDT computer to store child pornography and when he failed to find that Zweizig spoliated material evidence.

NDT's assignments of error in the arbitrator's decision, whether considered collectively or singly, do not constitute an argument that the arbitrator engaged in misconduct or other misbehavior. Instead, they constitute an argument that the decision should be vacated because the arbitrator erred. Arbitrator error constitutes grounds for vacatur only where the error is cognizable as "manifest disregard" of clearly applicable law. *See Collins*, 505 F.3d at 879. Here, however, NDT does not argue that the arbitrator manifestly disregarded law, but rather that he misapplied applicable law and/or made unsupported underlying factual findings; moreover, my own analysis of the arbitrator's decision in Zweizig's favor does not suggest that any such manifest disregard took place. Effectively, then, NDT requests that this court review the merits of the arbitrator's decision.

Review of the merits of the arbitrator's decision, including both the basis of his factual findings and the propriety of his legal conclusions, is outside the scope of this court's review. *See Collins*, 505 F.3d at 879; *G.C. & K.B. Invs.*, 326 F.3d at 1105. I therefore decline to analyze the merits of the arbitrator's findings of fact or conclusions of law. NDT has not met its burden to

establish grounds for discretionary vacatur pursuant to Sections 10(a)(3) or 10(a)(4).[6]

Because, for the foregoing reasons, NDT has failed to meet its burden to establish that the arbitrator's decision in Zweizig's favor should be vacated, NDT's petition for vacatur should be denied.

## II.    Zweizig's Petition

By and through his petition, Zweizig requests that the court vacate the arbitrator's award only to the extent the arbitrator declined to award Zweizig his attorney fees and costs incurred in connection with arbitral proceedings, and that the court otherwise confirm the award.  It is Zweizig's position that the arbitrator acted in manifest disregard of well-defined, explicit, and clearly applicable law that the arbitrator correctly understood and correctly stated, *see Collins*, 505 F.3d at 879, thereby exceeding his powers and giving rise to grounds for discretionary vacatur under 9 U.S.C. § 10(a)(4).  Zweizig notes, correctly, that under Oregon law award of attorney fees is mandatory to a plaintiff prevailing on a Or. Rev. Stat. 659A.230 retaliatory discharge claim.  That is, although by its plain language Or. Rev. Stat. 659A.885, the statute providing for a cause of action to employees adversely affected by an employment practice unlawful under specified statutes (including Section 230), provides only that "the court *may* allow the prevailing party costs and reasonable attorney fees at trial and on appeal" in connection with such an action, Or. Rev. Stat. 659A.885(1) (emphasis supplied), the Oregon courts have

---

[6] Oregon law provides for mandatory vacatur where a party establishes "[m]isconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding."  Or. Rev. Stat. 36.705(1)(b)(C).  For the reasons set forth above, NDT has not established that any such misconduct took place.  Mandatory vacatur under Section 705(1)(b)(C) would therefore be inapplicable even if the court were to apply Oregon's vacatur standard rather than the FAA standard.

nevertheless uniformly construed a prevailing *plaintiff*'s right to attorney fees under Or. Rev. Stat.

659A.885 as *mandatory*, whereas they have construed a prevailing *defendant*'s right to attorney

fees under that subsection as not merely discretionary but exceptional:

> Although that language is permissive, Oregon courts have construed it as
> mandatory and highly favorable to plaintiffs, holding that prevailing *plaintiffs* are
> entitled to recover their attorney fees. * * * Along those same lines, prevailing
> *defendants* generally cannot recover attorney fees unless they can show that the
> plaintiff brought a claim in bad faith or asserted a frivolous, unfounded, or
> objectively unreasonable claim. * * * In so holding, the courts have identified the
> statute's underlying legislative policy: promoting vigorous enforcement of
> employment discrimination statutes and encouraging employees with reasonable
> claims to assert them.

*Hamlin v. Hampton Lumber Mills, Inc.*, 227 Ore. App. 165, 167-168 (2009) (citations omitted;

emphasis original).

Oregon law requiring award of attorney fees to plaintiffs prevailing in connection with

Section 230 claims is, as Zweizig suggests, well defined, explicit, and clearly applicable to

Zweizig's statutory claim. Moreover, analysis of the parties' submissions to the arbitrator

establishes that the legal principle that award of fees to a prevailing Section 230 plaintiff is

mandatory was thoroughly and accurately briefed. However, Zweizig's evidentiary submissions

fail to establish that Crow " "understood and correctly stated the law, but proceeded to disregard

the same," a prerequisite for vacatur on the basis of manifest disregard, *see Collins*, 505 F.3d at

879, *quoting San Martine Compania*, 293 F.2d at 801.

Furthermore, the parties' Employment Agreement provided that the parties would "bear

their own respective attorney fees" incurred in connection with arbitration to resolve disputes

arising out of the agreement. While Zweizig offers a colorable argument that such provision is

necessarily unenforceable as unconscionably requiring him "to surrender important statutorily-

mandated rights," *Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1248 (9th Cir. 1994),

analysis of the parties' submissions establishes that the parties did not brief the arbitrator in

connection with the question whether the parties' contractual waiver of their statutory entitlement

to attorney fees was enforceable.  The record therefore contains no evidence to support the

conclusion that the arbitrator "understood and correctly stated" legal principles under which the

contractual waiver was unenforceable, "but proceeded to disregard the same."  In addition, I am

aware of no Ninth Circuit or Oregon cases unequivocally holding that contractual waiver of

statutory rights in connection with arbitration provisions are unenforceable when contained in

negotiated, arm's-length contracts such as the Employment Agreement, as opposed to adhesion

contracts, and the parties have cited none.  It is therefore difficult to characterize the legal

principle that contractual waivers of statutory rights are unenforceable outside the adhesion

context as "well-defined, explicit, and clearly applicable."

Finally, while it appears unlikely that the arbitrator could properly have found against

Zweizig as to his statutory retaliatory discharge claim (in connection with which prevailing

plaintiffs have a mandatory entitlement to attorney fees) while finding in Zweizig's favor as to his

wrongful discharge claim (in connection with which no entitlement to attorney fees is

implicated), Zweizig has not clearly established that the arbitrator did not do so, or that, if he did,

he did so in manifest disregard of well-defined, explicit, and clearly applicable law that he

understood and correctly stated.

For the foregoing reasons, Zweizig has not met his burden to establish that the arbitrator

exceeded his powers by denying Zweizig's prayer for attorney fees in manifest disregard of the

law.[7]  Zweizig's petition should therefore be denied.

## III.    Confirmation

Because no grounds have been established for vacating or modifying the arbitrator's award, the arbitrator's award should be confirmed in its entirety.  *See* 9 U.S.C. § 9.

## CONCLUSION

For the reasons set forth above, NDT's petition (#1) to vacate should be denied, Zweizig's petition (#9) to vacate in part and confirm in part should be denied to the extent it seeks vacatur of a part of the arbitral award and otherwise granted, and the underlying arbitral award should be confirmed in its entirety.  A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

/ / /

/ / /

/ / /

/ / /

/ / /

---

[7]  Oregon law provides for mandatory vacatur of an arbitrator's award where the "arbitrator exceeded the arbitrator's powers."  Or. Rev. Stat. 36.705(1)(d).  Because, for the foregoing reasons, Zweizig has not established that the arbitrator exceeded his powers, the same conclusion would obtain if the court were to apply Oregon's vacatur standard rather than the FAA standard.

Page 26 - FINDINGS AND RECOMMENDATION

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.


Dated this 18th day of November, 2011.

Honorable Paul Papak
United States Magistrate Judge